| | |
|---|---|
| L. JAMES COSTA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) No. 2:12-cv-378-JDL |
| | ) |
| CUMBERLAND FARMS, INC., | ) |
| | ) |
| Defendant | ) |

## RECOMMENDED DECISION ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

The defendant, Cumberland Farms, Inc. ("Cumberland Farms"), moves for summary judgment in its favor on the plaintiff, its former employee, L. James Costa's, remaining claims against it, alleging (i) age-based discrimination in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, and (ii) retaliation in violation of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 831 *et seq. See* Defendant Cumberland Farms, Inc.'s Motion for Summary Judgment ("Motion") (ECF No. 32) at 1-2; Plaintiff's Complaint for Hostile Work Environment, Retaliation, Medical Discrimination ("Complaint") (ECF No. 2-2), attached to Notice of Removal (ECF No. 2).[1] Cumberland Farms also seeks summary judgment on Costa's request for punitive damages. *See* Motion at 20-21.

For the reasons that follow, I recommend that the court grant the Motion with respect to Costa's MWPA claim and request for punitive damages, and otherwise deny it.

---

[1] On August 12, 2013, the parties stipulated to the dismissal with prejudice of Count III of the Complaint, which alleged disability discrimination, as well as Paragraph 33 of the Complaint and the words "or in retaliation for requesting a medical accommodation" in Paragraph 32 of the Complaint. *See* ECF No. 20; Complaint ¶¶ 32-33, 37-41.

# I. Applicable Legal Standards

## A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st

Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Costa as the nonmovant, reveal the following.[2]

Costa graduated from South Portland High School in 1966 and served in the Marine Corps from 1966 to 1968. Plaintiff's Separate Statement of Material Facts ("Plaintiff's Additional SMF") (ECF No. 38) ¶ 1; Defendant Cumberland Farms, Inc.'s Reply to Additional Statement of Fact ("Defendant's Reply SMF") (ECF No. 40) ¶ 1. Costa, who has lived in Hollis, Maine, since 1986, worked as a driver for Cumberland Farms from December 1975 until August 2000. Defendant Cumberland Farms, Inc.'s Statement of Material Facts ("Defendant's SMF") (ECF No. 33) ¶ 1; Plaintiff's Opposition to Defendant's Material Facts ("Plaintiff's Opposing SMF") (ECF No. 37) ¶ 1. He then worked as a transportation supervisor until January 4, 2012. *Id.*

Transportation supervisors are responsible for overseeing Cumberland Farms' transportation operations and drivers at one or more terminals, as well as having temporary supervisory responsibilities for other terminals when transportation supervisors are on a leave of absence. *Id.* ¶ 2. The drivers transport petroleum to stores and gas stations. *Id.*

---

[2] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise. To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given. I have omitted qualifications that are unsupported by the citation(s) given or are redundant. To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

During Costa's employment, Cumberland Farms had operations at terminals in South Portland, Maine; Chelsea, Massachusetts; Providence, Rhode Island; Albany (or Rensselaer), New York; Linden, New Jersey; New Haven, Connecticut; Woodbury, New Jersey; Brooklyn, New York; Holtsville, New York; Tampa, Florida; Cape Canaveral, Florida; Fort Lauderdale, Florida; and East Boston, Massachusetts. *Id*. ¶ 4. Cumberland Farms has employed the following individuals as transportation supervisors, in addition to Costa: Jerry Backus, Anthony Ritz, Joseph Becker, David Campbell, Austin Burke, Joseph Lech, Stephen Palumbo, and Bruce Twombly. *Id*. ¶ 5.

When Costa became a transportation supervisor, he took over supervision of both the Chelsea and South Portland drivers. Plaintiff's Additional SMF ¶ 4; Defendant's Reply SMF ¶ 4. When Costa became a transportation supervisor, the company had 11 terminals. *Id*. ¶ 5. When his employment was terminated, the company had 13 terminals. *Id*.

In September 2008, Dennis ("Greg") Scott was hired as the vice-president of transportation for Cumberland Farms. *Id.* ¶ 6. In the summer of 2010, Scott became the vice-president of terminal operations and the transportation group. Defendant's SMF ¶ 7; Plaintiff's Opposing SMF ¶ 7. At that time, Costa was the oldest transportation supervisor. Plaintiff's Additional SMF ¶ 23; Defendant's Reply SMF ¶ 23. In June 2010, Edward Potkay moved from his position as fleet administration manager to become the director of fleet operations. Defendant's SMF ¶ 6; Plaintiff's Opposing SMF ¶ 7. The fleet administration manager is in charge of company vehicles and maintenance. *Id*. As the director of fleet operations, Potkay supervised Manuel Estevez, who had supervised the transportation supervisors since 2006 to 2007. *Id*. Prior to June 2010, Potkay had worked for Cumberland Farms for almost 30 years. *Id*.

Cumberland Farms' employee handbook contains its equal employment opportunity and anti-harassment policies, together with a procedure that employees should use to report any perceived harassment or retaliation. Defendant's SMF ¶ 76; Exh. A (ECF No. 33-15) to Affidavit of Michelle Hayes ("Hayes Aff.") (ECF No. 33-14), attached to Defendant's SMF. The company regularly distributes these policies to its employees. Defendant's SMF ¶ 76; Hayes Aff. ¶ 3.

## A. Friction Between Costa and Potkay

Prior to June 2010, Costa and Potkay had "butted heads" many times during their employment at Cumberland Farms. Defendant's SMF ¶ 31; Plaintiff's Opposing SMF ¶ 31. In fact, prior to June 2010, Costa and Potkay had several heated discussions about a variety of subjects, such as Potkay's use of outside vendors, his allocation of expenses to the terminals, and his attitude toward drivers and mechanics. *Id.* Costa felt that, prior to June 2010, Potkay was abusive and disrespectful toward the drivers. *Id.*

Costa described an example of the longstanding personality conflict between himself and Potkay involving a heated discussion in 2005 about a company car that Potkay had ordered for Costa. *Id.* ¶ 32. Potkay, who was responsible for purchasing Costa's company car, refused to get the features that Costa requested. *Id.* The day after their heated discussion, Costa suffered a heart attack for which he required hospitalization. *Id.* After Costa left the hospital, he contacted Potkay's supervisor about the dispute, and Potkay bought Costa the company car he wanted. *Id.* According to Costa, his relationship with Potkay was never the same after the events in 2005; "he was so angry that he had to order another car for me that he made it very, very obvious. And it was just downhill." *Id.*[3]

---

[3] I omit Cumberland Farms' further assertion that Costa believes that the decision to lay him off was a direct result of the personality conflict between himself and Potkay arising, among other issues, from the 2005 car incident, Defendant's SMF ¶ 33, which Costa denies, Plaintiff's Opposing SMF ¶ 33.

Before Potkay became Costa's direct supervisor, "[i]t was well known that [Potkay] and [Costa] did not have a great working relationship." *Id*. ¶ 62. Costa believed that Potkay was "offensive to almost everyone who ever worked for him" and "watched him for years intimidate people." *Id*.

## B. Controversy Over Food and Bar Bill Tabs

Costa had concerns about alleged "fraudulent billing practices." Plaintiff's Additional SMF ¶ 38; Defendant's Reply SMF ¶ 38.[4] The fraudulent billing practices involved Scott, "Harwood" (presumably, Carl Wood), Estevez, and Potkay putting excessive liquor bills or bar tabs on the personal credit cards of the supervisors so that the charges would not appear on their own credit cards and be subject to disclosure to upper management. *Id*. ¶ 39.[5] They told Costa, "if we put it on our credit card, then we have to submit it to our boss and we can't do that." *Id*. ¶ 40.[6] The bar bills were excessive, greater than $400 to $500. *Id*. ¶ 42.[7]

---

[4] My recitation incorporates, in part, Cumberland Farms' qualification.

[5] Cumberland Farm qualifies this statement, Defendant's Reply SMF ¶ 39, asserting that Costa testified that "[t]hose concerns we based on the fact that we were asked – we were told to put liquor bills on our credit cards for drinks that were bought for the whole group, including Greg Scott and Carl Wood and Manny [Estevez] and Ed [Potkay], put it in on our expenses," Deposition of L. James Costa ("Costa Dep.") (ECF No. 39-2), attached to Index for Joint Record ("Index") (ECF No. 39), at 90, and that the reference to "Harwood" evidently was meant to be "Carl Wood," a fleet maintenance manager who reports to Estevez, Deposition of Wayne R. Thornhill ("Thornhill Dep.") (ECF No. 39-14), attached to Index, at 12, 45.

[6] I omit Costa's further assertion that Scott and Potkay wanted final say on expense approval to prevent their supervisor from becoming aware of the exorbitant amount of money being charged to the company for alcohol, which was against company policy. Plaintiff's Additional SMF ¶ 41. The statement is neither admitted nor supported by the citations given.

[7] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 42, asserting that (i) Backus, whose deposition testimony is cited, testified that the "highest bar bills" with which he was involved were $400 to $500, Deposition of Leslie G. Backus ("Backus Dep.") (ECF No. 39-1), attached to Index, at 25, (ii) it clearly was Backus's opinion that the bills were excessive, *id*., (iii) the group included nine or so transportation supervisors plus Estevez, Potkay, and Scott, Defendant's SMF ¶¶ 5, 8; Plaintiff's Opposing SMF ¶¶ 5, 8, and (iv) Scott testified that, so far as he was aware, Cumberland Farms did not place a preset limit on entertainment business expenses or the overall amount of expenses that could be charged on credit cards, Deposition of Dennis G. Scott ("Scott Dep.") (ECF No. 39-12), attached to Index, at 46, 57.

The transportation supervisors, Safety Manager Wayne Thornhill, and Scott, Potkay, and Estevez had quarterly meetings. Defendant's SMF ¶ 8; Costa Dep. at 97.[8] Beginning in 2008 or 2009, Scott and Potkay requested that one of the transportation supervisors or Thornhill pay for group charges or tabs, including liquor charges, with their personal credit card. Defendant's SMF ¶ 8; Costa Dep. at 93-94.[9] The stated reason for this practice was that Scott or Potkay wanted to control the reimbursement approval process rather than submitting the expense to one of their supervisors for approval. Defendant's SMF ¶ 9; Backus Dep. at 25-26. The managers used the phrase, "it is better to approve, than to be approved." *Id*. The group bills or tabs that were paid with personal credit cards were always reimbursed. Defendant's SMF ¶ 9; Costa Dep. at 94.

An incident occurred in Connecticut in 2011 at a company quarterly meeting in which Scott and Potkay asked Costa to put the excessive alcohol tab on his personal credit card, with Potkay explaining, "look, you put it on your credit card and we ok it no questions asked. We don't put it on ours because we don't want it to turn up above. That's when I said, you know, I'm not comfortable with that. And then I can't remember – I'm almost sure it was Ed, Ed said, how about putting it on your room, and I said, if that's what you want put it on my room, but I don't feel comfortable putting it on my credit card. They then put it on my hotel room." Plaintiff's Additional SMF ¶ 44; Defendant's Reply SMF ¶ 44.[10]

---

[8] Thornhill is not identified in this statement; however, he is elsewhere identified as Wayne Thornhill, the safety manager. Plaintiff's Additional SMF ¶ 54; Defendant's Reply SMF ¶ 54.

[9] I omit Cumberland Farms' further assertion that the charges were made at the quarterly meetings, Defendant's SMF ¶ 8, which Costa denies, Plaintiff's Opposing SMF ¶ 8, stating that the tabs were incurred after the meetings had concluded and the group went to the hotel bar, Affidavit of L. James Costa ("Costa Aff.") (ECF No. 37-1), attached to Plaintiff's Opposing SMF, ¶ 2.

[10] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 44, asserting that Costa did not dispute its statements that this event occurred prior to December 2010, Defendant's SMF ¶¶ 10-11, and that one of the dates must be incorrect. However, viewing the evidence in the light most favorable to Costa as nonmovant, I accept that the event occurred in 2011. I omit Costa's further statement that he became aware of the practice when Scott came onboard in June 2010, Plaintiff's Additional SMF ¶ 43, which is neither admitted nor supported by the citation given.

At the time of the event, it was a common practice for transportation supervisors to use a personal credit card to pay for expenses. Defendant's SMF ¶ 13; Costa Dep. at 91; Backus Dep. at 39.[11] Cumberland Farms did not issue company credit cards to the transportation supervisors. *Id.* After Costa declined to use his personal credit card to pay for the group's bill or tab, neither Potkay nor Scott treated him differently. Defendant's SMF ¶ 14; Costa Dep. at 99-101.[12]

Other transportation supervisors, including Backus, had been asked to pay for group expenses with their personal credit cards. Defendant's SMF ¶ 15; Backus Dep. at 24-25. Backus did not believe that he would get in trouble for using his personal credit card to pay for group expenses, even though he felt that the expenses sometimes were excessive. *Id.*[13]

Prior to the event at which Costa declined to use his personal credit card to pay for the group's bill, several other transportation supervisors had informed Scott and Potkay that they did not feel that it was appropriate for the transportation supervisors to use their personal credit cards to pay for the group's tab, including Polumbo, Backus, Campbell, and Lech. Defendant's SMF ¶ 16; Plaintiff's Opposing SMF ¶ 16. These concerns were raised by transportation supervisors in group meetings and individually. *Id.* Thornhill complained on several occasions that he felt it was inappropriate to be asked to pay for the group's bill with his personal credit card and that the amount of the expenses was excessive. *Id.* ¶ 17.

---

[11] I omit Cumberland Farms' description of the expenses as "reimbursable," Defendant's SMF ¶ 13, which Costa denies, Plaintiff's Opposing SMF ¶ 13.

[12] Costa denies this, stating that he described his treatment by Potkay and Estevez following the incident as "not good." Plaintiff's Opposing SMF ¶ 14. However, in the cited passage, he testified: "I think that the treatment was the same." Costa Dep. at 101. He then testified, in response to the question, "Okay. Not good in your opinion?": "That's correct." *Id.*

[13] Costa denies that Backus believed that expensing the excessive bar tabs was permissible, Plaintiff's Opposing SMF ¶ 15, asserting that Backus testified that he was not concerned about personal exposure because Potkay would approve the expenses, but that the expensing [and other issues] troubled him so much that he complained to Cumberland Farms President and Chief Executive Officer Ari Haseotes, Backus Dep. at 25-58.

On November 30, 2010, Potkay participated in a telephone conference with Costa and Estevez regarding an email exchange between Potkay and Costa the prior day. *Id*. ¶ 26. In the email exchange, Costa expressed concern about the tone of an email written by Potkay. *Id*. During the telephone conference, Potkay said that "[Costa] was going to listen and he was going to talk." *Id*. ¶ 27. Potkay also criticized Costa's attitude toward him. *Id*. When Costa asked Potkay to "hang on a minute" because what he was saying was "completely wrong," Potkay told Costa not to speak to him in that manner. *Id*. Potkay continued, "Let me tell you something, you want to shut your mouth, this is going to be a one-way conversation, do you understand me?" *Id.*

Costa, who felt that Potkay misunderstood a sequence of events, asked if Potkay had read his email in which Costa attempted to explain the correct sequence of events. *Id*. ¶ 28. Potkay responded that he did not bother to read it and terminated the conversation. *Id*.

After the conference call ended, Costa called Estevez to complain about Potkay's conduct toward him during the call. Defendant's SMF ¶ 29; Costa Dep. at 105. Costa told Estevez that Potkay's conduct on the telephone conference had created a "hostile work environment." *Id*. He also complained to Estevez that he did not feel it was appropriate that Potkay had asked him to pay for the group's tab with his personal credit card. Defendant's SMF ¶ 29; Costa Dep. at 103-04.[14]

After complaining about the "fraudulent billing practices," Costa requested that Estevez inform the Human Resources Department: "I wanted him to know that I had had enough of that and [Potkay's] practices, and I wanted those specifics to go to HR. And that was the total

---

[14] Costa denies that this statement reflects the full scope of his complaints to Estevez, Plaintiff's Opposing SMF ¶ 29, pointing out that he also told Estevez to notify Patty Firing in the corporate human resources department of his complaints. I have set forth Costa's statement regarding that conversation below.

conversation and then I hung up." *Id.* ¶ 49.  The next day, Estevez called Costa and indicated that he had not gone to Human Resources but had only spoken to Potkay.  *Id.* ¶ 50.  Costa testified:

> . . . I said wait a minute, you didn't take this to HR, and he said, no, he said, I talked to Ed about it.  And I said, Manny, I specifically asked that this go to HR because I have had it, I have had it with this.  And he said, Jimmy, I talked to Ed and that's the end of it.  And I reiterated that what I said and he shot right back at me, Jimmy, I said that's the end of it right here, it ends here.  He said, it ends here.

*Id.*[15]  Costa also complained to Backus, Campbell, Scott, and Potkay himself about the use of credit cards and the alcohol expenses.  *Id.* ¶ 46.[16]

After the November 30, 2010, discussion with Estevez, Costa did not raise his concerns about Potkay's conduct during the conference call or the expense reimbursement issue with Estevez or any other supervisor until after he was laid off on January 4, 2012.  Defendant's SMF ¶ 30; Costa Dep. at 118.[17]

On November 30, 2010, when Costa spoke with Estevez, Costa did not know whether Potkay's conduct during the earlier conference call violated any law.  Defendant's SMF ¶ 34; Costa Dep. at 120-21.[18]  However, Costa testified that he felt a lot of things were illegal.  *Id.* ¶ 53.[19]

The reference to Potkay's "fraudulent billing practices" contained in paragraph 12 of the Complaint is Costa's complaint to Estevez on November 30, 2010, concerning Potkay's request

---

[15] I have corrected typographical errors in this statement.

[16] My recitation incorporates in part Cumberland Farms' qualification.  I omit Costa's further assertion that he had several conversations with Estevez about the hostile work environment and the expensing of the alcohol, Plaintiff's Additional SMF ¶ 47, which is neither admitted nor supported by the citation given.

[17] Costa denies this, Plaintiff's Opposing SMF ¶ 30, but his denial is not supported by the citation given, in which Estevez testified regarding Costa's complaints to him about the manner in which Potkay was allocating expenses to different accounts, Deposition of Manuel J. Estevez ("Estevez Dep.") (ECF No. 39-5), attached to Index, at 59-60.  For the same reason, I omit Plaintiff's Additional SMF ¶ 48, which, as Cumberland Farms points out, Defendant's Reply SMF ¶ 48, bears on Costa's complaint to Estevez regarding Potkay's expense allocation.

[18] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 34, asserting that he felt that what Potkay did was against the law, Costa Dep. at 119.

[19] I omit Costa's further assertions that (i) he felt that creating a hostile work environment is against the law, Plaintiff's Additional SMF ¶ 51, sustaining Cumberland Farms' objection, Defendant's Reply SMF ¶ 51, that the statement is irrelevant, and (ii) he felt that the expensing of bar tabs was illegal, Plaintiff's Additional SMF ¶ 52, sustaining Cumberland Farms' objection, Defendant's Reply SMF ¶ 52, that it is not supported by the citation given.

that Costa use his personal credit card to pay for expenses incurred during a meeting of transportation supervisors and their managers. Defendant's SMF ¶ 35; Plaintiff's Opposing SMF ¶ 35.[20] Costa had "no idea" whether the reimbursement practice violated a law regarding theft or stealing. Defendant's SMF ¶ 35; Costa Dep. at 95.[21]

Costa explained that he did not know whether Potkay had requested that he engage in illegal conduct but that he felt the request was not appropriate:

> I didn't know whether it was illegal or not, but my feeling was don't do it, so my gut feeling was yeah, there is something wrong here. When management is telling you that if you put it on your credit card, they can okay it, but they don't want it to go further than their pay grade, then something is wrong here, and that's why I refused to do it.

Defendant's SMF ¶ 36; Costa Dep. at 181.

When asked what he thought might be illegal about Potkay's practice of asking transportation supervisors to put alcohol charges on their personal credit cards, Costa compared the request to a request to jump off a bridge:

> Just the fact that I was being asked to do something they didn't want to do themselves. That gives you a clue that something is wrong here. If somebody says how about jumping off the bridge and you say, well, you jump first, no, that's all right, you go ahead first, you think maybe something is wrong. I mean let's use common sense.

Defendant's SMF ¶ 37; Costa Dep. at 181-82.[22]

---

[20] I omit Cumberland Farms' characterization of the expenses as "reimbursable," Defendant's SMF ¶ 35, which Costa denies, Plaintiff's Opposing SMF ¶ 35.

[21] I have reworded Cumberland Farms' assertion that Costa had no idea whether the reimbursement practice violated *any* law, Defendant's SMF ¶ 35, to conform to the underlying citation. Costa denied the statement as originally worded, Plaintiff's Opposing SMF ¶ 35, but his denial is in the nature of a qualification: that he testified, "That's why I [sought] counsel to see if it was illegal because I felt what was done was illegal and that's why I went and – and made an appointment to find if my thoughts were correct[,]" Costa Dep. at 180.

[22] I have reworded Cumberland Farms' description of the question asked of Costa, Defendant's SMF ¶ 37, to conform to the underlying citation. With respect to paragraphs 36 and 37, Costa denies any inference that Potkay was not engaging in illegal conduct, Plaintiff's Opposing SMF ¶¶ 36-37, but his denial is in the nature of an argument rather than a qualification or denial of the underlying statements.

Costa had no idea whether the reimbursement practice was against company policies. Defendant's SMF ¶ 38; Costa Dep. at 94-95, 99-100.[23]  He felt that it was not appropriate for Potkay to ask him to use his personal credit card to pay for reimbursable business expenses because Cumberland Farms took too long to reimburse him for them.  Defendant's SMF ¶ 38; Costa Dep. at 102-03.[24]

Estevez did not report the complaint about reimbursement issues made by Costa during their November 30, 2010, telephone call to the Human Resources Department because he decided that the concerns were not serious enough to warrant such a report.  Defendant's SMF ¶ 40; Estevez Dep. at 62.[25]  Estevez did not investigate the complaints made by Costa during that telephone call because he was already well aware of their factual basis and did not feel that they warranted further action.  Defendant's SMF ¶ 41; Estevez Dep. at 61-62.[26]

In December 2010, Costa spoke to Wayne Thornhill, the safety manager.  Plaintiff's Additional SMF ¶ 54; Defendant's Reply SMF ¶ 54.  Costa told Thornhill of his conversation with Potkay.  Id. ¶ 55.  Costa testified that Thornhill "told me to be very careful, that I had a bull's eye on my back.  And I said what are you talking about and he said, I just wanted to tell you that you have to be careful about what you say and keep your cool.  And I said, where is this coming from,

---

[23] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 38, asserting, in cognizable part, that he thought that it was obvious that the practice was against company policy, Costa Dep. at 94-95.

[24] I omit Cumberland Farms' further assertion, Defendant's SMF ¶ 39, that Costa agrees that neither Potkay nor anyone else was personally enriched based on the reimbursement practices.  This assertion, which Costa denies, Plaintiff's Opposing SMF ¶ 39, is not supported by the cited portion of Costa's testimony, in which Costa stated that he did not contend that Scott or Potkay stole any money from the company, Costa Dep. at 95.

[25] Costa denies that the concerns were not serious enough to warrant the report, Plaintiff's Opposing SMF ¶ 40, but his denial is unsupported by the citation given, which concerns company policy regarding conduct that relates to harassment or retaliation.

[26] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 41, denying that the concerns were not serious enough to warrant further action given that company policy makes clear that "Supervisors and Managers who learn of conduct that might constitute harassment or retaliation . . . are required to immediately report it to their own supervisor, their local Human Resources representative or directly to the Manager of Employment Practices[,]" Exh. A to Hayes Aff. at [3].

and he said, it's coming from above, and I said, Ed and Greg[], and he said yes." *Id*. The conversation with Thornhill was within days of the phone conversation with Potkay and Estevez on November 30. *Id*. ¶ 56.

### C. Costa's Job Is Restructured

In July 2010, Cumberland Farms decided to move the East Boston terminal to Chelsea. *Id*. ¶ 24. The move would take place in October 2010. *Id*. As a result, Costa and Backus were to share responsibility for the Chelsea terminal. Plaintiff's Additional SMF ¶ 24; Costa Dep. at 57.[27] Costa was not happy with having to share the responsibility. Plaintiff's Additional SMF ¶ 24; Costa Dep. at 57-58.

In August 2010, Backus and Costa did in fact begin to share responsibilities, and continued to share duties through December 2010. Plaintiff's Additional SMF ¶ 25; Defendant's Reply SMF ¶ 25. In fact, in August the company also asked Costa and Backus to think about renting an apartment in Chelsea instead of staying in a hotel. *Id*. Backus also continued to be the transportation supervisor of the Albany, New York, terminal, and Costa also continued to be the transportation supervisor of the South Portland, Maine, terminal. Defendant's SMF ¶ 20; Backus Dep. at 8; Costa Dep. at 57.

On September 20, 2010, Potkay notified transportation supervisors, including Costa and Backus, that Cumberland Farms intended to hire a full-time transportation supervisor for the Chelsea facility. Defendant's SMF ¶ 21; Exh. A ("9/20/10 Potkay Email") to Affidavit of Manuel Estevez ("Estevez Aff.") (ECF No. 33-9), attached to Defendant's SMF. Potkay's email instructed the transportation supervisors to post the job opening at their respective facilities and stated,

---

[27] I omit Costa's further assertion that his responsibilities "would be cut back to share the Chelsea terminal[,]" Plaintiff's Additional SMF ¶ 24, which is neither admitted nor supported by the citation given.

"Anyone interested should contact Stephen Dolinich, including yourself if you're interested in the position." *Id.*[28]  Potkay added:

> Let me take this opportunity to thank Jim Costa and Jerry Backus for their on-going work and support of both the East Boston and Chelsea drivers.  The search for an additional supervisor is not a reflection of their work nor their standards.  It is the business need to have a full time supervisor for this location that will have more than 40 plus drivers.  Jim and Jerry are both an instrumental part of our team and will continue as we proceed forward.  Thanks Guys.

Plaintiff's Additional SMF ¶ 26; 9/20/10 Potkay Email.[29]

Neither Backus nor Costa applied, nor expressed interest in applying, for the open position.

Defendant's SMF ¶ 22; Backus Dep. at 9, 14-15; Scott Dep. at 23.[30]

After seeing the posting and reading Potkay's email, Costa was stunned, so he called Estevez.  Plaintiff's Additional SMF ¶ 27; Defendant's Reply SMF ¶ 27.  Estevez told him that a decision had been made to hire a supervisor for Chelsea, and Costa would be moved to South Portland full-time.  *Id.*  In November 2010, Potkay and Estevez told Costa that they had hired Anthony Puleio to be the transportation supervisor in Chelsea.  *Id.* ¶ 28.  Puleio was 52 at the time. *Id.* ¶ 29.[31]  Puleio started his training on December 6, 2010, and began actually working in Chelsea in January 2011.  Defendant's SMF ¶ 23; Plaintiff's Opposing SMF ¶ 23.

---

[28] Cumberland Farms cites the quoted portion of the Potkay email in support of the proposition that Potkay "invited each of the Transportation Supervisors to apply 'if you are interested in the position[,]'" Defendant's SMF ¶ 21, which Costa denies based on citation to the remainder of the Potkay email, Plaintiff's Opposing SMF ¶ 21.  Cumberland Farms' statement is a fair characterization of the cited portion of the email.  However, because the parties sharply dispute the email's meaning, I have set forth the full underlying quotation rather than the characterization.

[29] Again, because the parties sharply dispute this email's meaning, *see, e.g.*, Defendant's Reply SMF ¶ 26, I have set forth the full underlying quotation rather than the portion excerpted in Costa's statement of additional facts.  Plaintiff's Additional SMF ¶ 26.

[30] I omit Cumberland Farms' further assertion that Backus and Costa had the opportunity to seek the full-time transportation supervisor position at the Chelsea terminal, Defendant's SMF ¶ 22, which Costa denies, Plaintiff's Opposing SMF ¶ 22, viewing the record in the light most favorable to Costa as nonmovant.

[31] I omit Costa's further assertions that (i) Puleio had no experience in the petroleum field, Plaintiff's Additional SMF ¶ 29, (ii) when Puleio was hired, there was a plan in place to eliminate Costa a year or so later in South Portland, *id.* ¶ 30, and (iii) Costa was not offered the opportunity to be the transportation supervisor at Chelsea, *id.* ¶ 31, which are neither admitted nor supported by the citations given.  Paragraph 30 is supported only by a citation to Costa's conclusory testimony that he *believed* such a plan was in place, Costa Dep. at 149, and paragraph 31 only by a citation

Costa never had a discussion with Scott regarding the Chelsea position. Plaintiff's Additional SMF ¶ 32; Defendant's Reply SMF ¶ 32. Although Scott testified that he had a discussion with Costa about whether or not Costa wanted to take Chelsea or South Portland, such a conversation never happened. *Id*. ¶ 33.

In November 2010, Costa had a conversation with Scott about taking over as a terminal manager in South Portland, and Scott "reiterated the fact that he was not happy with Dave Moody and that he was a terrible manager and he wanted me to take over that position and that had been an on-going communication between Greg[] and I for months." *Id*. ¶ 34.[32] As of November 2010, Costa was qualified to take over the terminal manager position in South Portland as long as he had some guidance. *Id*. ¶ 35. In Costa's opinion, as well as Scott's, Costa could have easily grown into the position. *Id*.[33]

When the decision was made to move Costa to South Portland full-time, he asked Scott and Potkay what the long-term implication would be, given that South Portland had only 14 active drivers. *Id*. ¶ 36. Both men told Costa, "you don't have to worry about it because we're going to do a lot of different things and we are going to keep you busy." *Id*. Scott and Potkay alleviated Costa's concern. *Id*. ¶ 37. Costa testified, "I was told that my position would be secure, that after

---

to his testimony that there was no conversation during a certain meeting about his having the opportunity to be the transportation supervisor at Chelsea, *id*. at 60.

[32] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 34, asserting that, while Scott may have said that Costa should be prepared to take over the terminal manager position, he did not believe that Costa was qualified for it given that Costa did not know how to run a marine terminal, Scott Dep. at 29. It adds that Costa testified, "I never – I never expressed an interest in being the terminal manager." Defendant's Reply SMF ¶ 34; Costa Dep. at 72.

[33] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 35, asserting that Costa agreed that, as of November 2010, he was not qualified to be the terminal manager without additional training, and he conceded that he would have needed additional training in record keeping, safety regulations, OSHA requirements, and the marine part of the terminal operations, Costa Dep. at 72-73. It adds that, although Costa testified that Scott asked him if he was ready to take over the terminal manager position, Scott did not believe that he was qualified for the position. Defendant's Reply SMF ¶ 35; Scott Dep. at 29.

35 years, they had no intentions of doing anything different and that we're going to branch out, so my base was going to be in South Portland." *Id*.[34]

In December 2010, Costa spoke to Scott about his concern over the size of South Portland and "the fact that I have had so many of the drivers so long and I was going to a terminal with just a small operation and that I was concerned about the future of that and I was assured again that I had plenty of – plenty of things for me to do. . . . Scott said you just don't have to worry about it, we have got things in the fire and we're going to keep you busy, but he also at the same time was having a conversation about me replacing Moody too." *Id*. ¶ 57.

As of December 2010, South Portland had the same number of drivers and trucks as it did in 2006. Plaintiff's Additional SMF ¶ 58; Costa Dep. at 49.[35]

In January 2011, Costa trained Puleio for the Chelsea transportation supervisor position. Plaintiff's Additional SMF ¶ 59; Defendant's Reply SMF ¶ 59. Again in January 2011, Scott asked Costa if he was ready to take over the position of terminal manager in South Portland. *Id*. ¶ 60. In January 2011, Scott was still very unhappy with Moody, the South Portland terminal manager, and still wanted Costa to become the terminal manager. *Id*. ¶ 61.[36]

On February 1, 2011, Costa's responsibilities at Chelsea ended, and he was in South Portland full time. *Id.* ¶ 62. From February 1, 2010, to February 1, 2011, there was no change in

---

[34] I omit Cumberland Farms' statements that, at the time it decided to hire a full-time supervisor for the Chelsea terminal, Potkay, Scott, and Estevez believed that it would need a transportation supervisor in South Portland for the foreseeable future and did not foresee the position's elimination, Defendant's SMF ¶¶ 24-25, which Costa denies, Plaintiff's Opposing SMF ¶¶ 24-25.

[35] Cumberland Farms denies this, Defendant's Reply SMF ¶ 58; however, I view the evidence in the light most favorable to Costa, as nonmovant.

[36] Cumberland Farms qualifies paragraphs 60 and 61, Defendant's Reply ¶¶ 60-61, asserting that Scott did not believe that Costa was qualified for the position because he did not know how to run a marine terminal, Scott Dep. at 29, and Costa testified that he "never expressed interest in being the terminal manager[,]" Costa Dep. at 72.

the number of drivers in South Portland. *Id.* ¶ 64. South Portland had 14 active drivers, plus three on leave, for a total of 17. *Id.*

In June 2011, Costa told Thornhill that he would be interested in the terminal safety position. Id. ¶ 65. The terminal safety position was "within Costa's realm of experience." *Id.* ¶ 66.[37] No one ever spoke to Costa further about that position. Plaintiff's Additional SMF ¶ 67; Costa Dep. at 78.[38]

### D. Costa's Position Is Eliminated

In response to a question by Potkay, Estevez wrote an email on October 24, 2011, in which he outlined a plan to eliminate the transportation supervisor position at the South Portland terminal and distribute those duties to himself, Backus, other transportation supervisors, and Todd Cheever, who worked in compliance. Defendant's SMF ¶ 42; Estevez Dep. at 28-30 & Exh. 1 (ECF No. 39-6) thereto. That day, Estevez and Potkay continued their discussion about the duties of the transportation supervisor at the South Portland terminal and whether the position should be eliminated and the residual duties taken over by the terminal manager, Dave Moody. Defendant's SMF ¶ 43; Exh. C to Estevez Aff.[39]

In another October 24, 2011, email to Potkay, Estevez stated, "Question in Portland is do you need a full time supervisor with the small amount of trucks?" Defendant's SMF ¶ 44; Exh. D

---

[37] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 66, asserting that, while Costa believed the job was within his realm of experience, Thornhill, the individual interviewing applicants for the position, believed that Costa did not have the requisite experience, education, and knowledge for it, Thornhill Dep. at 46.

[38] Cumberland Farms denies this, Defendant's Reply SMF ¶ 67; however, I view the evidence in the light most favorable to Costa, as nonmovant.

[39] Costa, in effect, qualifies paragraphs 41 and 42, Plaintiff's Opposing SMF ¶¶ 41-42, denying that Cumberland Farms took initial steps to eliminate the South Portland transportation supervisor position on October 24, 2011, or that he was no longer needed in South Portland, Exh. 1 ("5/29/12 Scott Memo") (ECF No. 39-13) to Scott Dep.; Costa Dep. at 63, 132-33.

to Estevez Aff.[40]  On October 24, 2011, Potkay responded to Estevez's email by stating, "Sounds like we really don't need LJC.  How do you propose we do it.  Quick and clean or allow him notice?"  Defendant's SMF ¶ 45; Exh. C to Estevez Aff.  Estevez responded, "I think the decent thing to do is allow notice.  But that backfires sometimes.  Too much, drama, calling everyone, talking to drivers, etc. etc. . . . .  Sometimes the best thing to do is to cut out clean."  *Id.*[41]

In late 2011, Estevez believed that Cumberland Farms did not need to employ a full-time transportation supervisor at the South Portland terminal, based on plans to streamline the operations at the South Portland terminal and reduce the number of drivers and trucks.  Defendant's SMF ¶¶ 46-47; Estevez Dep. at 30.[42]

Potkay and Estevez discussed the decision to eliminate the transportation supervisor position at the South Portland terminal with Scott, who understood that the primary reason was the reduction in the number of trucks and drivers at the South Portland terminal.  Defendant's SMF ¶ 48; Scott Dep. at 13-14, 16.  Scott also believed that the move was motivated by the expense of employing a transportation supervisor when there was insufficient work to warrant the position.  *Id.*[43]

On December 5, 2011, Potkay sent an email to Tracey Alves, who worked in Cumberland Farms' Human Resources Department, requesting that she prepare the appropriate documentation and checks related to a layoff of Costa, which he expected to occur on January 4, 2012.

---

[40] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 44, denying, *inter alia*, that South Portland had a small number of trucks, Costa Dep. at 66, 142.

[41] Costa again denies that he no longer was needed in South Portland.  Plaintiff's Opposing SMF ¶ 45; Costa Dep. at 63, 132-33.

[42] Costa, in effect, qualifies these statements, Plaintiff's Opposing SMF ¶¶ 46-47, denying that Cumberland Farms had any plan to reduce the number of trucks or drivers or that his position was no longer needed, Costa Aff. ¶ 4.

[43] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 48, denying that the number of trucks and drivers had been reduced in South Portland or that there was insufficient work to justify the transportation supervisor position, Costa Dep. at 63, 66, 132-33, 142.

Defendant's SMF ¶ 49; Plaintiff's Opposing SMF ¶ 49. The Cumberland Farms Reductions-In-Workforce and Recall policy allowed for severance pay in the context of permanent separation. Defendant's SMF ¶ 49; Exh. B (ECF No. 33-16) to Hayes Aff. [44]

In January 2012, Firing spoke with Scott who told her that the transportation supervisor position in South Portland was no longer needed and that the terminal manager, Moody, was qualified to take over the residual tasks. Defendant's SMF ¶ 65; Deposition of Patricia Firing ("Firing Dep.") (ECF No. 39-8) at 47. Scott also told her that the gas volume was down because they were removing trucks and drivers from the terminal. Defendant's SMF ¶ 65; Firing Dep. at 47-48.[45]

On January 4, 2012, Potkay and Estevez drove to the South Portland terminal at about 9:30 in the morning. Plaintiff's Additional SMF ¶ 80; Defendant's Reply SMF ¶ 80. Costa said to himself, "this isn't good." *Id.* Estevez said that the company had made the decision to eliminate the position of transportation supervisor in South Portland. *Id.* ¶ 81. He added that the company had decided to make Moody, the terminal manager, responsible for the day-to-day oversight of the drivers. Defendant's SMF ¶ 59; Costa Dep. at 128. Costa asked, "what are your plans for me, and Ed said, what do you mean by that. I said, well, obviously you have something planned for me, and he said, no, we don't have any openings at this time . . . and Ed said, it came from senior management and HR." Plaintiff's Additional SMF ¶ 82; Defendant's Reply SMF ¶ 82. Costa then asked, "you don't have anything in this company for me to do with all the stuff that you have got

---

[44] Costa admits that Potkay sent the email but denies that Cumberland Farms followed company procedure by releasing Costa instead of Puleio or Moody. Plaintiff's Opposing SMF ¶ 49; Costa Aff. ¶ 5; Costa Dep. at 71.

[45] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 65, denying that the transportation supervisor job was no longer needed, Moody was qualified to take over the residual tasks, or gas volume was down, Costa Dep. at 63, 71, 132-33.

going on, and he [Potkay] said nope." *Id*. ¶ 83. Costa understands upper management to be Scott. *Id*. ¶ 84.

Potkay and Estevez gave Costa a check representing 26 weeks of severance, in the amount of more than $40,000. Defendant's SMF ¶ 59; Costa Dep. at 129, 131-32. Potkay asked whether Costa had boxes to pack up his personal belongings. Defendant's SMF ¶ 59; Costa Dep. at 130. Estevez offered to give Costa a ride home, which Costa declined, stating that he would call his wife. *Id*. The company made no attempt to relocate Costa. Plaintiff's Additional SMF ¶ 78; Defendant's Reply SMF ¶ 78. Moody, who was originally hired on March 15, 1971, was born in March 1947. Defendant's SMF ¶ 60; Plaintiff's Opposing SMF ¶ 60. Costa was born in June 1947. *Id*.

Costa expected that, if the transportation supervisor position in South Portland were eliminated, he would be transferred to the terminal in Chelsea because he had "a lot more seniority than any other supervisor in that friggin company." Defendant's SMF ¶ 63; Costa Dep. at 147-48.[46]

Costa claims that he should have been hired for the fleet and terminal safety compliance supervisor position. Defendant's SMF ¶ 66; Plaintiff's Opposing SMF ¶ 66. He had not applied for the position. *Id*. The position of fleet and terminal safety compliance supervisor was open at the time that Costa was laid off. Defendant's SMF ¶ 67; Thornhill Dep. at 46. In Thornhill's opinion, Costa was not qualified for that position. *Id*. Firing reviewed the job description and

---

[46] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 63, denying that this was the only reason he expected to be transferred to Chelsea and noting that Potkay and Scott had assured him his position was going to be secure and they would keep him busy, Costa Dep. at 63-64.

determined that Costa was not qualified for the position because he had no terminal experience. Defendant's SMF ¶ 68; Firing Dep. at 19.[47]

## E. Rationale for Layoff Decision

Scott and/or Potkay claimed that the reason for the elimination of Costa's job was that the gas volume, delivered volume had dropped. Plaintiff's Additional SMF ¶ 85; Plaintiff's Opposing SMF ¶ 85.[48] Estevez testified that Costa's position was eliminated because of the limited number of drivers and trucks. *Id.* ¶ 68.[49]

In determining the size of a facility from the transportation side, one looks at the number of drivers, number of trucks, scope of the responsibilities of a transportation supervisor, and volume of gallons of petroleum delivered. *Id.* ¶ 69. Every terminal should have a full-time supervisor. *Id.* ¶ 70.[50]

Estevez admits that, at the time that the decision was made to eliminate Costa's position in South Portland, conditions had not changed since the decision was made to transfer Costa to South Portland on a full-time basis. *Id.* ¶ 71.[51] In fact, Cumberland Farms documents show that the volume of gasoline delivered from the South Portland terminal had increased, and it serviced more locations.

---

[47] Costa, in effect, qualifies paragraphs 67 and 68, Plaintiff's Opposing SMF ¶¶ 67-68, denying that he was not qualified for the fleet and terminal safety compliance supervisor position or did not have terminal experience, Costa Dep. at 175-76.

[48] I have corrected a typographical error in the statement, which referred to "delivery" volume rather than "delivered" volume.

[49] I omit Cumberland Farms' assertion that Backus believes that Costa was laid off as a result of a personal vendetta by Potkay, Defendant's SMF ¶ 61, sustaining Costa's objection, Plaintiff's Opposing SMF ¶ 61, that, as Backus testified, that belief is based on speculation.

[50] Cumberland Farms admits that this was Costa's opinion, but notes that Estevez and Potkay did not share it. Defendant's Reply SMF ¶ 70; Estevez Dep. at 29-30; Exh. C to Estevez Aff.

[51] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 71, asserting that (i) Estevez testified that he and Potkay had been engaged in a "discussion of moving some of the work over to another area because of financial or because of economic reasons" and had determined that "South Portland did have a surplus of trucks[,]" Estevez Dep. at 77-78, (ii) Estevez testified that the plan was to move the drivers and trucks to other terminals, *id.* at 44-45, (iii) in an email to Potkay dated October 24, 2011, Estevez stated, "Like I said, sooner or later [the terminal] will go down to 4 trucks and should be easy to manage[,]" Exh. C to Estevez Aff., and (iv) Costa agreed that the number of tractors decreased from eight in 2009 to four in 2012, Costa Dep. at 142-45.

Plaintiff's Additional SMF ¶ 75; Costa Dep. at 133-41.[52]  The number of drivers also remained the same. Plaintiff's Additional SMF ¶ 76; Defendant's Reply SMF ¶ 76.[53]

Further, the South Portland facility acquired the Sewall stations, one in Brunswick, one in Cumberland, one in South Portland, and one in Saco, which were high-volume stations.  Plaintiff's Additional SMF ¶ 86; Defendant's Reply SMF ¶ 86.  This acquisition increased delivery volume by quite a bit.  Plaintiff's Additional SMF ¶ 86; Costa Dep. at 133.  Cumberland Farms documents show that the volume of gasoline increased out of the South Portland terminal in 2011.  Plaintiff's Additional SMF ¶ 87; Costa Dep. at 139-40.[54]  In 2011, the delivered volume went up, and the number of tractors and tanks went down because they were replaced with higher volume equipment.  Plaintiff's Additional SMF ¶ 89; Defendant's Reply SMF ¶ 89.  In 2011, the South Portland terminal actually gained accounts.  Plaintiff's Additional SMF ¶ 90; Costa Dep. at 52.[55] The South Portland location, thus, needed a full-time supervisor.  Plaintiff's Additional SMF ¶ 77; Costa Dep. at 46, 63-64.[56]  At the time of Costa's termination, the only proposed change at South Portland was to eliminate a spare truck with no tank.  Plaintiff's Additional SMF ¶ 79; Costa Dep. at 49.[57]

---

[52] Cumberland Farms denies this, Defendant's Reply SMF ¶ 75; however, I view the evidence in the light most favorable to Costa, as nonmovant.

[53] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 76, asserting that the statement fails to specify the time period to which it pertains and, in the cited deposition testimony, Costa stated that there was no change in the number of drivers at the South Portland terminal from February 1, 2010, to February 1, 2011, Costa Dep. at 66, 142.

[54] Cumberland Farms denies this in part, Defendant's Reply SMF ¶ 87; however, I view the evidence in the light most favorable to Costa, as nonmovant.

[55] Cumberland Farms denies this, Defendant's Reply SMF ¶ 90; however, I view the evidence in the light most favorable to Costa, as nonmovant.

[56] Cumberland Farms denies this, Defendant's Reply SMF ¶ 77; however, I view the evidence in the light most favorable to Costa, as nonmovant.

[57] Cumberland Farms denies this, Defendant's Reply SMF ¶ 79; however, I view the evidence in the light most favorable to Costa, as nonmovant.

Scott wrote a memo dated May 29, 2012, in which he stated that the decision to eliminate the transportation supervisor position in South Portland was driven by several factors. Plaintiff's Additional SMF ¶ 9; Defendant's Reply SMF ¶ 9. He stated:

. . . Once the Transportation and Terminal Operations were grouped into one organization, the operational improvements became very obvious on both sides of the equation. When looking at either organization individually, it was clear that the Terminal group lacked a succession plan even though the current leadership is at or very near to retirement eligibility. When we looked at the overall organization, it became very obvious that in areas where we had lower numbers of Drivers & Trucks, we would transition the Transportation Supervisor's duties over to the Terminal Manager (in most cases the Transportation Supervisor is not qualified to replace the Terminal Manager). The Gulf Terminals that have CFI Trucks co-located (S. Portland, Chelsea, New Haven, & Linden), depending on the complexity level of the terminal (large storage, high volume, marine or pipeline, etc.) along with the current personnel's previous work experience, were the determining factors in selecting a position to maintain or in some cases add. Linden, added a Terminal Supervisor who will take on the responsibilities of the trucks & Drivers co-located in the terminal. New Haven, incorporated the current Transportation Supervisor into the Terminal Org Chart (due in part to the Transportation Supervisor's previous experience in a Marine Terminal), Chelsea, the plan will be to have the current Transportation Supervisor report to the Terminal Manager and begin training as a Terminal Supervisor (Chelsea is a marine facility and coupled with the throughput & storage the requirements for manpower are higher). South Portland, the trucks and Drivers report to the Terminal Manager (we currently use either a Transportation Supervisor from another area or The Operations Manager to do weekly payroll while the Terminal Manager gets up to speed).

All of the changes listed above were discussed with the President, & COO of Gulf L.P. and the Vice President of Human Resources for the Cumberland Gulf Group of Companies prior to making the changes. The VP of Human Resources was consulted on the timing of releasing the Transportation Supervisor in South Portland prior to notification of same. This topic was discussed several times over the past three years (Woodbury Terminal was the first major organizational change we made) so everyone associated with the changes had a voice in the decision making process from the beginning to end.

5/29/12 Scott Memo; *see also* Plaintiff's Additional SMF ¶¶ 10-13; Defendant's Reply SMF ¶¶ 10-13.[58]

---

[58] I have quoted the Scott memorandum in full, including a portion omitted by Costa. *See* 5/29/12 Scott Memo. I omit Costa's assertion that Cumberland Farms moved him to South Portland as part of a three-year plan to eliminate

During meetings with the transportation supervisors, Scott stated that he was concerned that the company did not have a succession plan in place and that several of the company's managers were long-term employees. Defendant's SMF ¶ 70; Costa Dep. at 148. Costa testified, "it was brought up at several meetings we had with Greg [Scott] and he said, our work force is getting up in age, we have got to start looking for younger replacements. And guess what, Jim Costa was the oldest one there and had been there the longest." Plaintiff's Additional SMF ¶ 14; Costa Dep. at 148.[59] Scott would constantly make age-related comments such as referring to older employees or Costa as an old fart. Plaintiff's Additional SMF ¶ 15; Defendant's Reply SMF ¶ 15.[60] Costa believes that Scott made the statement in a joking manner. Defendant's SMF ¶ 71; Costa Dep. at 168-69. Costa cannot remember the exact words or context of the statements. Defendant's SMF ¶ 71; Costa Dep. at 169.

Potkay would also reiterate that "the company needed to bring in younger managers." Plaintiff's Additional SMF ¶ 17; Defendant's Reply SMF ¶ 17.[61] Potkay and Scott made the comments about bringing in younger managers in 2011, stating, "our management is getting up there in age and we have to start thinking of younger management[,]" or comments such as, "you

[59] I omit Costa's assertion that Scott made these remarks "[s]ubsequent to the inception of the plan," Plaintiff's Additional SMF ¶ 14, which is neither admitted nor supported by the citation given. I have also recast the quotation to be that of Costa rather than Scott. As Cumberland Farms suggests, Defendant's Reply SMF ¶ 14, it is not clear that, with respect to the final sentence, Costa meant to be quoting Scott directly.

[60] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 15, asserting that the cited testimony provides no evidentiary basis concerning the frequency of "sly comments" Scott made; however, Costa testified that Scott made such remarks "on a regular basis[,]" Costa Dep. at 157. Cumberland Farms adds that Costa was unable to remember any age-related comments other than the "old fart" comments and conceded that he could not remember the context of those alleged comments. Defendant's Reply SMF ¶ 15; Costa Dep. at 158-59, 169.

[61] Cumberland Farms qualifies this statement, Defendant's Reply SMF ¶ 17, admitting that Costa testified that Potkay and Scott made similar comments about the need for a "succession plan" and to consider the need to train younger managers, Costa Dep. at 160, 170.

guys are getting up in age and we have to think of younger management because of the high stress paced environment that we are in." *Id*. ¶¶ 18-19. Potkay said several times that the company "needed to start planning on younger supervisors because of the age of some of us." *Id*. ¶ 21.

In reference to Carl Wood, Potkay made one comment that Wood was too old to invest in and that he had forgotten more about working or maintaining trucks than others would ever learn. Defendant's SMF ¶ 72; Plaintiff's Opposing SMF ¶ 72. Wood continues to work at Cumberland Farms. *Id*. ¶ 73.

Other than speaking to other transportation supervisors, Costa did not complain to anyone at Cumberland Farms about Potkay's or Scott's allegedly age-based remarks. Defendant's SMF ¶ 74; Costa Dep. at 171-72.

Presently, the South Portland terminal has the same number of drivers and trucks as it had when Costa was fired. Plaintiff's Additional SMF ¶ 94; Defendant's Reply SMF ¶ 94.[62] Cumberland Farms has not hired anyone to be the terminal supervisor in its South Portland terminal to replace Costa. Defendant's SMF ¶ 69; Plaintiff's Opposing SMF ¶ 69.[63]

### F. Others Complain About Potkay

At various times prior to December 2011, Lech, Backus, and Thornhill discussed their concerns about Potkay's behavior, including his manipulative, harassing way of managing, statements that his job "was to protect my king," "shut up," and never giving details. *Id*. ¶ 50. Backus was also concerned about Potkay's drinking habits. *Id*.

---

[62] I omit Costa's further assertions regarding (i) the contents of a letter to him from Firing, Plaintiff's Additional SMF ¶ 92, sustaining Cumberland Farms' objection that they are inadmissible hearsay, Defendant's Reply SMF ¶ 92, and (ii) the reasons that Cumberland Farms terminated the job of Terminal Supervisor Joe Becker, Plaintiff's Additional SMF ¶ 93, sustaining Cumberland Farms' objection that the statement is predicated on speculation by Costa, not personal knowledge, Defendant's Reply SMF ¶ 93.

[63] Costa qualifies this statement, Plaintiff's Opposing SMF ¶ 69, asserting that Cumberland Farms distributed Costa's responsibilities to the other transportation supervisors, Exh. C to Estevez Aff.

In December 2011, Backus spoke with Debra White, the executive assistant to Ari Haseotes, the president and chief executive officer of Cumberland Farms, about Backus' concerns regarding Potkay's behavior. *Id.* ¶ 51. White in turn spoke with Haseotes about Backus' concerns. *Id.* Haseotes asked White to tell Backus, Thornhill, and Lech to appoint a spokesperson to speak with him. *Id.* ¶ 52. In December 2011, Backus spoke with Haseotes by phone and told him about the behavior of Potkay, Scott, and Estevez. *Id.* Backus did not mention Costa during that conversation. *Id.*[64]

Haseotes spoke with Patricia Firing, Cumberland Farms' vice-president of human resources, and asked her to investigate Backus' concerns. *Id.* ¶ 54. As part of her investigation, in December 2011, Firing spoke with several people, including White, Backus, Thornhill, Cathy Currie, Polumbo, and Mark Sault, but she did not interview Costa. *Id.* Thornhill told Firing that employees were intimidated by Scott and Potkay. *Id.* ¶ 55. He referenced statements such as, "Change the people or change the people," and "I'm king. It's your job to protect the king." *Id.*

On December 16, 2011, Joseph Becker, a transportation supervisor, sent Estevez a letter complaining about Potkay's behavior. Defendant's SMF ¶ 56; Exh. 2 (ECF No. 39-7) to Estevez Dep. After reviewing the letter, Estevez spoke with Becker and said that he did not think that the conduct constituted a hostile work environment. Defendant's SMF ¶ 56; Estevez Dep. at 54-56.[65]

Becker was not involved in the original complaint to Haseotes regarding Potkay. Defendant's SMF ¶ 75; Costa Dep. at 178-79.[66] Becker was laid off in February 2012 because Cumberland Farms did not need two transportation supervisors in the New York area and

---

[64] I omit Cumberland Farms' further assertion that, after Backus spoke with Haseotes in December 2011, his relationship with Scott improved, Defendant's SMF ¶ 53, which Costa denies, Plaintiff's Opposing SMF ¶ 53.

[65] Costa, in effect, qualifies this statement, Plaintiff's Opposing SMF ¶ 56, denying that the concerns were not serious enough to warrant such a report, Exh. A to Hayes Aff. at [3].

[66] I omit Cumberland Farms' further assertion that Becker was interviewed by Firing as part of her investigation, Defendant's SMF ¶ 75, which is neither admitted nor supported by the citation given.

Cumberland Farms' agreement with Mobil to employ Becker for one year had expired. Defendant's SMF ¶ 75; Estevez Dep. at 56-59.[67] Lech took over Becker's responsibilities. *Id.*

Backus, Thornhill, Lech, and Sault are all still employed with Cumberland Farms. Defendant's SMF ¶ 57; Costa Dep. at 122; Backus Dep. at 40-41.[68] In May 2013, Thornhill was promoted to the director of petroleum transportation, which is similar to Potkay's former role. Defendant's SMF ¶ 64; Plaintiff's Opposing SMF ¶ 64.

As early as spring 2010, Backus spoke with Costa about whether Costa wanted to participate in making a formal complaint to Cumberland Farms about Potkay. *Id.* ¶ 58. Costa told Backus that he was not interested in participating in the complaint because he was concerned about retaliation. *Id.* Other than those preliminary discussions with Backus, Costa did not participate in the complaints raised to Haseotes in December 2011. *Id.*

### III. Discussion

Cumberland Farms seeks summary judgment as to both of Costa's remaining claims, for age discrimination in violation of the MHRA and retaliation in violation of the MWPA, as well as his request for punitive damages. *See* Motion at 9-21.

### A. Age Discrimination Claim

### 1. Applicable Legal Standard

The MHRA prohibits employers from discharging and otherwise discriminating against employees because of their age. *See* 5 M.R.S.A. § 4572(1)(A). As the parties recognize, *see* Motion at 9 n.1; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 36) at 7-8, "Maine courts apply the MHRA in

---

[67] Costa denies that Becker's contract had expired, Plaintiff's Opposing SMF ¶ 75, but his denial is not supported by the citation given.

[68] I omit Cumberland Farms' further assertion that Becker is still employed with Cumberland Farms, Defendant's SMF ¶ 57, which Costa denies, Plaintiff's Opposing SMF ¶ 57.

accordance with federal anti-discrimination law, including the ADEA [Age Discrimination in Employment Act]," *Phair v. New Page Corp.*, 708 F. Supp.2d 57, 63 n.4 (D. Me. 2010) (citation omitted).

"The ADEA makes it illegal for an employer 'to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) (quoting 29 U.S.C. § 623(a)(1)). In similar fashion, the MHRA makes it illegal, in relevant part, for any employer to discharge an employee "because of" age. 5 M.R.S.A. § 4572(1)(A).

To prove an ADEA violation, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009). "Unlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.* at 174.

"Direct evidence . . . consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision[.]" *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) (citation and internal quotation marks omitted). "The high threshold for this type of evidence requires that mere background noise and stray remarks be excluded from its definition." *Id.* (citations and internal quotation marks omitted). "A statement that can plausibly be interpreted two different ways – one discriminatory and the other benign – does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Id.* (citation and internal quotation marks omitted).

"Where, as here, an employee lacks direct evidence that the employer's actions were motivated by age animus, the *McDonnell Douglas* burden-shifting framework dictates the progression of proof." *Suarez*, 229 F.3d at 53.

"The first step in this progression involves the employee's prima facie case." *Id*.

The elements of the prescribed prima facie case vary, within the age discrimination context, depending upon whether or not the plaintiff was dismissed as part of a reduction in force. If there was no reduction in force, a plaintiff must establish: (1) he was at least forty years old; (2) he met the employer's job performance expectations; (3) the employer took an adverse employment action against him; and (4) he was replaced by a person with roughly equivalent job qualifications. If there was a reduction in force, the fourth element changes and a plaintiff must establish either that the employer did not treat age neutrally or that younger persons were retained in the same position.

*Phair*, 708 F. Supp.2d at 63-64 (citations and internal quotation marks omitted).

Once a plaintiff establishes a *prima facie* case, the *McDonnell Douglas* rubric shifts the burden to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation and internal quotation marks omitted). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Id*. (citation and internal quotation marks omitted).

Once the defendant meets this burden, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Id*. at 142-43 (citations and internal quotation marks omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 143 (citation and internal quotation marks omitted). In attempting to satisfy this burden, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citations and internal quotation marks omitted).

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. *See also, e.g., Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430-31 (1st Cir. 2000) (once plaintiff makes out *prima facie* case and defendant meets its burden of production, "the focus [at summary judgment] should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by age discrimination.") (citations and quotation marks omitted).

## 2.  Analysis

Cumberland Farms seeks summary judgment as to Costa's age discrimination claim on the bases that (i) he cannot establish a *prima facie* case because he cannot show, with respect to the fourth element, that Cumberland Farms did not treat age neutrally or that a younger person with similar qualifications filled his former position, and, (ii) even assuming *arguendo* that he makes out a *prima facie* case, Cumberland Farms meets its burden of demonstrating that he was laid off for a legitimate reason, and he cannot satisfy his ultimate burden that "but for" his age, he would not have been laid off. *See* Motion at 9-13.

With respect to Costa's *prima facie* case, Cumberland Farms argues that:

1.     When it laid Costa off, it permanently eliminated the position of transportation supervisor at the South Portland terminal. *See id.* at 10. Because the position no longer exists, it could not have hired anyone to fill it, and has not done so. *See id.*

2.    To the extent that Costa might allege that Cumberland Farms had an ongoing need for his former duties at the South Portland terminal, those duties were assumed by someone older than him, Terminal Manager David Moody.  *See id.*

3.    There is no evidence to suggest that anyone involved directly or indirectly in the layoff decision – Estevez, Scott, Potkay, or Firing – considered Costa's age.  *See id.* at 10-11. Instead, Cumberland Farms made a business decision that the anticipated workload in South Portland did not warrant a full-time transportation supervisor.  *See id.* at 11.

4.    The mere fact that Costa was the oldest transportation supervisor does not demonstrate age-based discrimination.  *See id.*

Cumberland Farms contends that, for the same reasons, Costa cannot meet his ultimate burden of showing that, but for his age, he would not have been laid off.  *See id.* at 12-13.

### a.  *Prima Facie* Case

Costa disputes, on several bases, that he fails to make out a *prima facie* case of age discrimination.  *See* Opposition at 8-12.  However, I need consider only one of his arguments, which I find dispositive in his favor: that there was a continuing need for his South Portland job duties and, pursuant to the applicable test, Moody's age is irrelevant.  *See id.* at 10.

As Cumberland Farms acknowledges, *see* Motion at 10, the First Circuit has deemed it relevant, for purposes of establishing an ongoing need for an individual's services, that his or duties were assumed by others, *see Connell v. Bank of Boston*, 924 F.2d 1169, 1173 (1st Cir. 1991). However, Cumberland Farms contends that, to meet the applicable test, Costa must also show that his duties were assumed by a younger individual.  *See* Motion at 10; Defendant Cumberland Farms, Inc.'s Reply to Plaintiff's Response to Its Motion for Summary Judgment ("Reply") (ECF No. 41)

at 3-4. Cumberland Farms observes that, because Moody was older than Costa, Costa cannot make that showing. *See id*.

In so arguing, Cumberland Farms confuses the test applicable to reductions in force with that applicable in other situations. In *Connell*, the First Circuit applied the latter test, noting that the "[t]he final requirement for making a *prima facie* case is that [the plaintiff] was replaced by someone with qualifications similar to his own." *Connell*, 924 F.2d at 1173. While the First Circuit noted that the plaintiff had presented evidence that, after the date of his termination, two people, both of whom were younger, were hired and ostensibly took on the job functions of the plaintiff's disbanded unit, the test itself does not require a showing that those who assumed the functions of an eliminated position were younger. *See id*. at 1172-73. Put differently, when a plaintiff whose position has been eliminated can show that others assumed his or her residual job duties, he or she need not make out a *prima facie* case by way of the test applicable in reduction in force situations. *See also, e.g., Vélez v. Thermo King de P.R., Inc*., 585 F.3d 441, 449 (1st Cir. 2009) ("We previously have stated that a replacement need not be sought from outside the company nor need he be designated formally as such.") (citation and internal punctuation omitted).[69]

Cumberland Farms' own evidence indicates that, following the elimination of Costa's position, his residual job duties were assumed by Moody, who was to receive assistance from the operations manager or a transportation supervisor until he got up to speed. *See* 5/29/12 Scott Memo. Transportation supervisors, who filled in for one another from time to time, *see*

---

[69] Cumberland Farms cites *Schuler v. Polaroid Corp*., 848 F.2d 276, 278 (1st Cir. 1988), in support of the proposition that, because Costa's position no longer exists, it could not and has not hired anyone to fill it. *See* Motion at 10. *Schuler*, in which the court applied the test applicable to reductions in force, is distinguishable in that, there, most of the duties that the plaintiff had performed ceased to be performed after his position was eliminated. *See Schuler*, 848 F.2d at 278.

Defendant's SMF ¶ 2; Plaintiff's Opposing SMF ¶ 2, fairly can be said to have had roughly equivalent qualifications. And, for purposes of assuming Costa's duties, one fairly can infer that Moody's qualifications were similar to those of Costa. If anything, they arguably were not as robust, given Moody's need for temporary assistance in assuming those new duties.

Costa, thus, makes out a *prima face* case for purposes of his age discrimination claim.

### b. Ultimate Burden of Showing Age Discrimination

Costa does not dispute that Cumberland Farms meets its burden of articulating a legitimate, nondiscriminatory reason for his January 4, 2012, layoff. *See* Opposition at 12. However, he argues that he adduces sufficient evidence to raise a triable issue that its articulated reasons were pretextual, and its real reason was age-related. *See id*. at 12-17. I agree.

Cumberland Farms maintains that the reason for Costa's layoff was the lack of need for a full-time transportation supervisor in South Portland, in view of the number of trucks and drivers at the terminal and the amount of gas that was being delivered. *See, e.g*., Reply at 7. However, Costa offers evidence that (i) Estevez admitted that, at the time the decision was made to eliminate Costa's position, conditions had not changed since the decision had been made to transfer him there on a full-time basis, *see* Plaintiff's Additional SMF ¶ 71; Defendant's Reply SMF ¶ 71, (ii) Cumberland Farms documents show that the volume of gasoline delivered from the South Portland terminal had increased, and it serviced more locations, as of 2011, *see* Plaintiff's Additional SMF ¶¶ 75-76, 86-87; Costa Dep. at 133-41, and (iii) the number of tractors and tanks went down in 2011, as delivered volume went up, because they were replaced with higher volume equipment, *see* Plaintiff's Additional SMF ¶ 89; Defendant's Reply SMF ¶ 89. In addition, as discussed above, while Cumberland Farms eliminated Costa's position, it did not eliminate his residual job duties.

A fact-finder crediting Costa's evidence, and drawing all reasonable inferences therefrom, could find that Cumberland Farms' stated reasons for Costa's layoff were pretextual.

Moreover, on the totality of the evidence viewed in the light most favorable to Costa, a fact-finder could conclude that Cumberland Farms terminated Costa's employment because of his age. It is undisputed that, in the summer of 2010, when Scott became the vice-president of terminal operations and the transportation group, Costa (then 63 years old) was Cumberland Farms' oldest transportation supervisor. *See* Defendant's SMF ¶¶ 7, 60; Plaintiff's Opposing SMF ¶¶ 7, 60; Plaintiff's Additional SMF ¶ 23; Defendant's Reply SMF ¶ 23.

Costa offers evidence that Potkay and Scott, two of the decision-makers in his layoff, expressed concern at several meetings with transportation supervisors that Cumberland Farms' work force was getting up in age, the company lacked a succession plan, and it needed to start looking for younger replacements. *See* Plaintiff's Additional SMF ¶ 14; Costa Dep. at 148; Plaintiff's Additional SMF ¶¶ 17-19, 21; Defendant's Reply SMF ¶¶ 17-19, 21. In his May 29, 2012, memorandum explaining the reorganization that led to Costa's layoff, Scott confirms that he was concerned about the lack of "a succession plan even though the current leadership is at or very near to retirement eligibility." 5/29/12 Scott Memo. Further, he states that the reorganization was discussed several times over a three-year period. *Id*. One can reasonably infer that the need to replace older managers with younger ones was on Scott's mind, or more generally on Cumberland Farms' mind, when it undertook the reorganization that led to Costa's layoff.

Moreover, shortly after Scott became vice-president of terminal operations and the transportation group, Costa's job duties began to change. Costa had supervised both the South Portland and Chelsea terminals since becoming a transportation supervisor in August 2000. *See* Defendant's SMF ¶ 1; Plaintiff's Opposing SMF ¶ 1; Plaintiff's Additional SMF ¶ 4; Defendant's

Reply SMF ¶ 4. However, after Cumberland Farms moved the East Boston terminal to Chelsea in July 2010, Costa began sharing responsibility for supervision of the Chelsea terminal with Backus. *See* Plaintiff's Additional SMF ¶ 24; Costa Dep. at 57. Costa was retrenched to supervision of only one terminal, South Portland, after Cumberland Farms hired the younger Puleio in November 2010 to supervise the Chelsea terminal. *See* Plaintiff's Additional SMF ¶¶ 28-29; 62; Defendant's Reply SMF ¶¶ 28-29, 62.[70]

Cumberland Farms points out that, in Potkay's September 20, 2010, email announcing the full-time opening in Chelsea, he invited all transportation supervisors to apply for the full-time Chelsea position, and Costa did not apply. *See* Motion at 10 n.2. Yet, a reasonable fact-finder could infer that the Chelsea position was not truly open to Costa. Costa says that he was so stunned after reading the email that he called Estevez, who told him that a decision had been made to hire a supervisor for Chelsea and move Costa to South Portland full time. *See* Plaintiff's Additional SMF ¶ 27; Defendant's Reply SMF ¶ 27. In addition, Potkay's email can be read to suggest that he envisioned that Costa and Backus would continue in some capacity other than supervising the Chelsea terminal. *See* 9/20/10 Potkay Email ("The search for an additional supervisor is not a reflection of their work nor their standards. . . . Jim and Jerry are both an instrumental part of our team and will continue as we proceed forward.").

Costa sought and received reassurance from Scott and Potkay that there was plenty to keep him busy full-time in South Portland. *See* Plaintiff's Additional SMF ¶¶ 36-37; Defendant's Reply SMF ¶¶ 36-37. Indeed, Costa offers evidence that the South Portland terminal was just as busy, if

---

[70] For purposes of summary judgment I have assumed, without deciding, that Cumberland Farms is correct that any claim by Costa relating to events prior to May 10, 2011, including the hiring of Puleio to manage the Chelsea terminal, is time-barred. *See* Reply 2-3. However, "a discriminatory act which is not made the basis for a timely charge may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *Rivera-Torres v. Ortiz Velez*, 341 F.3d 86, 98 (1st Cir. 2003) (citations and internal punctuation omitted).

not more so, when he was laid off only about a year later.  *See id*. ¶¶ 64, 71, 86; Plaintiff's Additional SMF ¶ 75; Costa Dep. at 133-41.  Yet, his position was eliminated based on a purported diminution in business and lack of need.

What is more, according to Costa, both Potkay and Scott made age-related comments, such as referring to Costa as an "old fart."  Plaintiff's Additional SMF ¶¶ 15, 72; Defendant's Reply SMF ¶¶ 15, 72.  While such "stray remarks" are "insufficient standing alone to show discriminatory animus," they "may still be considered evidence of a company's general atmosphere of discrimination," and "tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Velázquez-García v. Horizon Lines of P.R., Inc*., 473 F.3d 11, 18-19 (1st Cir. 2007) (citations and internal quotation marks omitted).

The evidence in its totality, viewed in the light most favorable to Costa, suffices to permit a reasonable fact-finder to conclude that Costa was laid off because of his age.  Accordingly, Cumberland Farms' bid for summary judgment as to the age discrimination claim should be denied.

## B.  Retaliation Claim

### 1.  Applicable Legal Standard

The MWPA provides, in relevant part:

**1.        Discrimination prohibited.** No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

> **A.**      The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

***

**2.    Initial report to employer required; exception.**  Subsection 1 does not apply
to an employee who has reported or caused to be reported a violation, or unsafe
condition or practice to a public body, unless the employee has first brought the
alleged violation, condition or practice to the attention of a person having
supervisory authority with the employer and has allowed the employer a reasonable
opportunity to correct that violation, condition or practice.

Prior notice to an employer is not required if the employee has specific reason to
believe that reports to the employer will not result in promptly correcting the
violation, condition or practice.

26 M.R.S.A. § 833.

"The MWPA prohibits an employer from taking adverse action against an employee who

reports a suspected violation of a law or rule." *LePage v. Bath Iron Works Corp*., 2006 ME 130,

¶ 19, 909 A.2d 629, 635.  "Although the MWPA provides no private right of action, plaintiffs may

file a civil action under the MHRA." *Osher v. University of Me. Sys*., 703 F. Supp.2d 51, 64 n.13

(D. Me. 2010).

"To establish a *prima facie* case of unlawful retaliation under state and federal law, [a

plaintiff] must show that (1) she engaged in an activity protected by the applicable statute; (2) she

suffered an adverse employment action; and, (3) the adverse employment action was causally

connected to the protected activity." *Id*. at 65.  "The burden of making out a *prima facie* case is

not onerous." *Daigle v. Stulc*, 794 F. Supp.2d 194, 237 (D. Me. 2011) (citations and internal

quotation marks omitted).

"Following the shifting burdens analysis described in *McDonnell Douglas Corp. v. Green,*

411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), once the plaintiff has shown a protected

activity followed in close proximity by an adverse employment action, this gives rise to an

inference that a causal connection is established; the employer, then, will be required to produce

some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment

action." *LePage*, 2006 ME 130, ¶ 19, 909 A.2d at 636 (citations and internal punctuation omitted). "The final burden to prove the existence of the causal nexus remains with the plaintiff." *Id*. "[U]nder First Circuit authority, the Court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Daigle*, 794 F. Supp.2d at 237 (citations and internal quotation marks omitted).[71]

## 2. Analysis

Costa alleges that (i) he "complained to his direct supervisor, Manuel Estevez, about Mr. Potkay's fraudulent billing practices as well as his abusive treatment of [Costa,]" Complaint ¶ 12, (ii) Estevez "refused to report [Costa's] complaint to Human Resources[,]" *id.*, and (iii) Cumberland Farms retaliated against him, in violation of the MHRA, "after he complained about the illegal and fraudulent billing practices of his supervisor[,]" *id*. ¶ 34. The reference to Potkay's "fraudulent billing practices" contained in paragraph 12 of the Complaint is Costa's complaint to Estevez on November 30, 2010, concerning Potkay's request that Costa use his personal credit card to pay for expenses incurred during a meeting of transportation supervisors and their managers. Defendant's SMF ¶ 35; Plaintiff's Opposing SMF ¶ 35.

Cumberland Farms seeks summary judgment as to Costa's retaliation claim on the basis that he cannot establish a *prima facie* case because he cannot show, with respect to the first prong, that he engaged in protected activity or, with respect to the third prong, that there was a causal connection between any protected activity and his layoff. *See* Motion at 13-19. It adds that, even assuming *arguendo* that Costa makes out a *prima facie* case, it has articulated a legitimate, nondiscriminatory reason for his layoff. *See id*. at 19. I agree that Costa's claim founders on the first prong of his showing of a *prima facie* case.

---

[71] "The MWPA analysis is guided by federal case law construing analogous statutes." *Halkett v. Correctional Med. Servs., Inc.*, 763 F. Supp.2d 205, 220 (D. Me. 2011).

As Cumberland Farms points out, *see* Motion at 15-16, Costa was not the first employee to bring the food and bar tab reimbursement practice to management's attention, *see* Defendant's SMF ¶¶ 16-17; Plaintiff's Opposing SMF ¶¶ 16-17. It contends that, because Costa did not "blow the whistle" on the practice, he did not make a "report" for purposes of the MWPA. *See* Motion at 15-16. Cumberland Farms notes, *see id.* at 15, that (i) this court has concluded that "it is a basic prerequisite to a whistleblower protection claim [pursuant to the MWPA] that the plaintiff has actually blown the proverbial whistle[,]" *Tripp v. Cole*, No. Civ. 03-289-PS, 2004 WL 2185840, at *4 (D. Me. Sept. 24, 2004) (rec. dec., *aff'd* Oct. 13, 2004), *aff'd*, 425 F.3d 5 (1st Cir. 2005), and (ii) the Law Court has assumed without deciding that, for purposes of the MWPA, a "report" must be the first to alert management or the authorities of the complained-of conduct, *see Currie v. Industrial Sec., Inc.*, 2007 ME 12, ¶ 26, 915 A.2d 400, 407. Cumberland Farms reasons that, on these facts, Costa did not make a "report" pursuant to the MWPA. *See* Motion at 15-16. Costa fails to respond to this seemingly meritorious argument. *See* Opposition at 18-20; Reply at 5 n.6. Accordingly, Cumberland Farms demonstrates its entitlement to summary judgment on this basis.

Alternatively, as Cumberland Farms argues, *see* Motion at 16, Costa fails to demonstrate that he subjectively believed that the conduct of which he complained violated a law or rule and that any such belief was objectively reasonable, as required to show that he engaged in protected activity pursuant to the MWPA, *see Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154-55 (Me. 1991).

Cumberland Farms contends that Costa cannot prove that he subjectively believed the conduct at issue was illegal because he admitted that he did not know whether it was. *See* Motion at 16-17. It adds that, even assuming that Costa harbored such a subjective belief, he does not demonstrate that the belief was objectively reasonable given that (i) there is nothing illicit about

the general practice of having an employee pay the cost of a business expense with the understanding that he or she will later be reimbursed, even when that expense covers entertainment or liquor, (ii) Costa does not suggest that Potkay or anyone else was personally enriched by the practice, (iii) Costa agreed that this process of reimbursement was Cumberland Farms' standard practice for many years and may have been consistent with its company guidelines, and (iv) Costa offered no factual basis to show that a reasonable person in his position could have believed the practice unlawful. *See id*. at 17.

In response, Costa identifies "[t]he protected activity at issue [as] involv[ing] Scott and Potkay unethically expensing or charging the company for their excessive bar tabs incurred after the quarterly supervisor meetings." Opposition at 18. He contends:

> Scott and Potkay knew their supervisors would not approve such expenses, so they circumvented the approval process by requiring the transportation supervisors to pay for the charges and then submit the charges to Scott or Potkay for approval. The bottom line is that Scott and Potkay were submitting false expense accounts which clearly amount to unethical conduct and theft from the company.

*Id*.

He argues that a jury could infer that he believed the conduct was illegal because he testified that he believed it was, although he did not actually know whether it was, and he "thus subjectively believed the conduct was unethical." *Id.* at 19. He contends that "a jury could also objectively infer that submitting false expenses to deceive an employer was unethical and amounted to fraudulent billing." *Id*. at 20. He cites *Estate of Roach v. TRW, Inc*., 754 A.2d 544 (N.J. 2000), for the proposition that "an employee engages in protected activity by reporting the submission of false expense accounts to upper management." *Id.* at 18.

A subjective belief that conduct is unethical is not tantamount to a subjective belief that it is illegal. *See, e.g., Bard*, 590 A.2d at 154 ("Bard presented no evidence to show a belief on his

part, as required by the [MWPA], that BIW was in any way acting illegally. In fact, his testimony at trial established no more than that he believed that a violation of *contract* provisions might have occurred.") (emphasis in original). This, in itself, is dispositive of Costa's retaliation claim.

In any event, even assuming *arguendo* that Costa did believe that the conduct at issue was illegal, he fails to show that any such belief was reasonable. The evidence does not bear out his assertion that Scott and Potkay were submitting "false expense accounts" amounting to "theft from the company" or "fraudulent billing."

In *Estate of Roach*, the alleged improper activities included filing a false expense report seeking reimbursement for a minor lunch expense, filing false time cards, and leasing equipment on behalf of the employer, a federal defense contractor, for personal use. *See Estate of Roach*, 754 A.2d at 604.

By contrast, Costa demonstrates, at most, that Scott and Potkay asked the transportation supervisors to charge expenses actually incurred following company business meetings to their personal credit cards, with the understanding that the transportation supervisors would seek reimbursement of the expenses, which Scott or Potkay would approve. *See* Defendant's SMF ¶¶ 8-9; Costa Dep. at 93-94; Backus Dep. at 25-26. To be sure, there is also evidence that Backus and others thought that those expenses, particularly bar tabs, were excessive, *see, e.g.*, Plaintiff's Additional SMF ¶ 42; Defendant's Reply SMF ¶ 42; Defendant's SMF ¶ 15; Backus Dep. at 24-25, and that Scott and Potkay made comments tending to suggest that they did not pay for the tabs with their own credit cards because they wanted to evade scrutiny of the expenditures by their supervisors, *see, e.g.*, Plaintiff's Additional SMF ¶ 44; Defendant's Reply SMF ¶ 44; Defendant's SMF ¶ 9; Backus Dep. at 25-26. Yet, Costa introduces no evidence that the company had a policy prohibiting the manner in which expenses were claimed, the amounts expensed, or the items for

which expenses were claimed, including liquor. While, despite this evidentiary vacuum, one might be able to draw a reasonable inference that Scott's and Potkay's practices were unethical, it is simply too great a stretch to infer that the conduct at issue amounted to theft from Cumberland Farms or was in any other manner illegal. Costa, accordingly, falls short of demonstrating that any such subjective belief was objectively reasonable.

Cumberland Farms, accordingly, is entitled to summary judgment with respect to Costa's retaliation claim.[72]

## C. Request for Punitive Damages

Cumberland Farms finally seeks summary judgment on two alternative grounds as to Costa's request for punitive damages. *See* Motion at 20-21; Complaint at 5. First, it argues that Costa cannot prove by clear and convincing evidence, as required by Maine law, that it discriminated with malice or with reckless disregard of his rights pursuant to the MHRA. *See* Motion at 20; 5 M.R.S.A. § 4613(2)(B)(8)(c); *Batchelder v. Realty Resources Hospitality, LLC*, 2007 ME 17, ¶ 22, 914 A.2d 1116, 1124. Second, it argues that it adduces sufficient evidence to qualify for the affirmative defense to punitive damages recognized in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999), for employers who make good-faith efforts to comply with the requirements of antidiscrimination laws. *See* Motion at 20-21.[73]

Even assuming *arguendo*, as Costa argues, *see* Opposition at 20-21, that he meets his burden of demonstrating by clear and convincing evidence that Cumberland Farms discriminated

---

[72] I need not, and do not, consider a third basis on which Cumberland Farms contends that Costa fails to make a *prima facie* showing that he engaged in protected conduct: that he did not act in "good faith" for purposes of the MWPA because he was not motivated to stop or publicize the underlying conduct. *See* Motion at 14-15.

[73] Cumberland Farms assumes the applicability of the federal *Kolstad* good-faith defense in the MHRA context, *see* Motion at 20-21, presumably on the basis of its observation earlier in its motion that courts have interpreted the MHRA in a manner consistent with the federal ADEA and have used federal anti-discrimination law to interpret the MHRA, *see id.* at 9 n.1. My research confirms that, in at least one case, this court has applied the *Kolstad* good-faith defense to a request for punitive damages pursuant to both the MHRA and parallel federal law, in that case, a Title VII claim. *See Davis v. Emery Worldwide Corp.*, 267 F. Supp.2d 109, 128-31 (D. Me. 2003) (rec. dec., *aff'd* Aug. 11, 2003).

against him with malice or with reckless disregard of his rights, Cumberland Farms is entitled to summary judgment as to punitive damages based on its invocation of the *Kolstad* good-faith affirmative defense.

The First Circuit, noting that "*Kolstad* did not articulate any specific evidence necessary for a finding of good-faith effort[,]" has held:

> [A] written non-discrimination policy is one indication of an employer's efforts to comply with Title VII.  But a written statement, without more, is insufficient to insulate an employer from punitive damages liability.  A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate.

*Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000).  The First Circuit found, in *Romano*, that an employer failed to meet this evidentiary burden when it "did not put forth evidence of an active mechanism for renewing employees' awareness of the policies through either specific education programs or periodic re-dissemination or revision of their written materials[,]" "[t]here was no testimony by appellants' witnesses that indicated that supervisors were trained to prevent discrimination from occurring[,]" and "appellants did not give examples in which their anti-discrimination policies were successfully followed."  *Id*.  However, the First Circuit noted, "We do not hold that appellants were required to present evidence on *all* of these factors in order to qualify for the good-faith defense."  *Id*. (emphasis in original).

Cumberland Farms demonstrates not only that it has anti-discrimination policies but also that it has an active mechanism for renewing employees' awareness of them through its periodic re-dissemination of those materials.  *See* Defendant's SMF ¶ 76; Hayes Aff. ¶ 3 & Exh. A thereto. This seemingly meets its burden of demonstrating its entitlement to the *Kolstad* good-faith defense, as construed by the First Circuit in *Romano*.  Costa does not argue otherwise.  *See* Opposition at 20-21.  Indeed, he does not address Cumberland Farms' good-faith defense argument at all.  *See*

*id.* Cumberland Farms, therefore, is entitled to summary judgment on Costa's request for punitive damages.

## IV.  Conclusion

For these reasons, I recommend that the court **GRANT** Cumberland Farms' motion for summary judgment as to Costa's claim of retaliation in violation of the MWPA and his request for punitive damages, and otherwise **DENY** it.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of May, 2014.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge